UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

In the Matter of the Complaint of
Wilson Yachts, LLC

James S. Astriku, *et al.*

            Claimants and
            Third Party Plaintiffs,      Civil No.: 1:20-cv-03452-JRR

vs.

Sail Away, LLC, *et al.*

            Third Party Defendants.

## MEMORANDUM OPINION

This matter comes before the court on Plaintiff Wilson Yachts, LLC's ("Wilson Yachts") Motion for Summary Judgment or Partial Summary Judgment, Third Party Defendant Sail Away, LLC's ("Sail Away") Motion for Summary Judgment, and Third Party Defendant Steven Michael Coffman's Motion for Partial Summary Judgment. (ECF 59, 60 and 63, respectively; the motions are referred to as the "Wilson Yachts Motion," the "Sail Away Motion," and the "Coffman Motion".)  The court has reviewed all motions papers.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2021.)

### BACKGROUND AND UNDISPUTED FACTS

The parties do not dispute the following:

The Verified Complaint (ECF 1) arises out of the drowning death of Jerry Astriku while on a recreational day trip on a sailing vessel, the Seven Day Weekend ("SDW"), owned by Wilson Yachts.   Third Party Defendant Sail Away managed SDW under a Charter Management

Agreement with Wilson Yachts entered November 30, 2016. (ECF 59, Ex. 3; the "Management Agreement".)  Wilson Yachts has two members, Robert and Deborah Sholtes.

By Bareboat Charter Agreement of August 8, 2019, Sail Away chartered SDW to Mr. Samuel Brew for recreational use for one day (August 8, 2019).  (ECF 59, Ex. 4; the "Charter Agreement".)  The terms of the Charter Agreement state that Mr. Brew had "full control of" and "full authority" over SDW's "management" for the duration of the charter.  *Id.* ¶16.  Further, pursuant to the Charter Agreement, Mr. Brew was "responsible for the navigation of [SDW]" or, if he was not competent to navigate the vessel, Mr. Brew was required to hire a captain of his choosing (subject to confirmation of industry standard qualifications), which obligation could be discharged by hiring a captain on Sail Away's "pre-approved list" of captains.  Regardless of the means by which Mr. Brew secured a captain, the Charter Agreement required Mr. Brew to pay the captain for his services directly.  *Id.* ¶15.

Mr. Brew was not competent to captain SDW and did not engage a third party to do so on his own.  Instead, Third Party Defendant Steven Michael Coffman, one of Sail Away's pre-approved captains, was selected to captain the SDW charter.  At the time of the charter, Mr. Coffman held a United States Coast Guard 50-ton Master's license, had sailed more than one hundred passenger boats, and had captained several charters for Sail Away and other charter companies.  (ECF 59, Ex. 8 at pp. 28, 79; Ex. 9.)  Mr. Brew had previously chartered another vessel through Sail Away in April 2019 under a charter agreement identical to that through which he chartered SDW.  (ECF 59, Ex. 5.)

Neither Robert Sholtes nor Deborah Sholtes, the sole members of Wilson Yachts (ECF 59, Ex. 2 at pp. 25-26), was aboard SDW on the day of the charter, and but for their status as members of the LLC, the Sholteses had no involvement in the Charter Agreement.

On the day of the charter, August 24, 2019, Mr. Brew was accompanied by his two guests, brothers Jerry Astriku (the decedent) and Claimant/Third Party Plaintiff James Astriku. While the boat was anchored, the brothers expressed a desire to swim. Neither of the Astriku charter guests knew how to swim. Captain Coffman demonstrated how to don the personal flotation devices ("PDFs") and secured a PDF on James Astriku. Decedent Jerry Astriku entered the water with an improperly secured PDF and drowned.

Wilson Yachts filed this action for exoneration from or limitation of liability pursuant to the Limitation of Shipowners' Liability Act, 46 U.S.C. §§ 30501 *et seq*. (the "Act"). James Astriku, individually and in his capacity as administrator of the Estate of Jerry Astriku, and the decedent's parents, Joseph and Felicia Astriku, filed claims against Wilson Yachts, Sail Away and Captain Coffman for damages for decedent's death. James Astriku also claims personal injury due to the incident and seeks damages for negligent infliction of emotional distress.

**STANDARD**

Federal Rule of Civil Procedure 56(a) provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party;" a fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986).

At the summary judgment stage, the facts are considered in the light most favorable to the nonmoving party. *Ausherman v. Bank of America Corp.,* 352 F.3d 896, 899 (4th Cir. 2003). However, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

At the summary judgment stage "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### ANALYSIS

**I.    The Wilson Yachts Motion**

    **a.    Limitation of Liability**

Wilson Yachts argues that, at a minimum, the Act entitles it to a limitation of liability.  The Act restricts a shipowner's liability to the "value of the vessel and pending freight" provided the fault causing the loss occurred without the shipowner's "privity or knowledge."  46 U.S. § 30505(a) and (b).  In determining whether the Act limits a shipowner's liability, "first, the court must consider what acts of negligence or conditions of unseaworthiness caused the accident." Second, the court must determine whether the shipowner had "privity or knowledge" of the acts. *Hellenic Lines, Ltd. v. Prudential Lines, Inc.,* 730 F.2d 159, 166 (4th Cir. 1984)*; Empresa Lineas Maritimas Argentinas S.A. v. U.S.*, 730 F.2d 153, 155 (4th Cir. 1984). Claimants bear the burden to prove the instrument of unseaworthiness; following which the burden shifts to the shipowner to prove a lack of privity or knowledge.  730 F.2d 159 (4th Cir. 1984).  Privity under the Act means "that a shipowner knew or should have known that a condition existed" or had "some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury."  *Hellenic Lines, Ltd.,* 730 F.2d at 166; *Coryell v. Phipps*, 317 U.S. 406, 411 (1942). Charging an owner with privity or knowledge "usually implies some degree of culpable participation or neglected duty on the shipowner's part." *Matter of Manhattan by Sail, Inc.*, No. 12-CV-8182 (VEC), 2018 WL 6684768 at *3 (S.D.N.Y. September 14, 2018) (citing *Otal Inv. Ltd. V. M/V Clary*, 673 F.3d 108, 115 (2nd Cir. 2012)).

In *Matter of Manhattan by Sail, Inc.*, a passenger on a cruise was injured by a part of the sail over which the deckhand had lost control.  The court limited the shipowner's liability concluding there was "no evidence that [the owner] was aware or should have been aware that the [deckhand] might handle the line carelessly. [The owner] was not on the vessel the day of the incident and did not observe [the incident.]"  *Id.*  In contrast, the court in *Tug Ocean Prince, Inc. v. U.S.*, imputed knowledge or privity to the shipowner because the owner knew of the crewmember's incompetence as a captain for that particular journey and was in contact with the vessel via dispatch.  584 F.2d 1151 (2nd Cir. 1978).

Applying the two-part test to the instant case, the "acts of negligence or conditions of unseaworthiness" on which the Astriku parties rely are limited to the alleged incompetence of Captain Coffman.  Evaluation of a captain's competence includes consideration of "whether the captain, pilot, and navigator are licensed; whether they have satisfactory safety records; whether they are familiar with the vessel and the waters on which it travels; and whether they are adequately trained."  *Illinois Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 872, 886 (N.D. Ill. 1989).  Further, "while it is possible to estimate the competency of a vessel's crew by examining their experience and licenses, perhaps the dispositive measurement is their performance as crew members."  *Matter of Ta Chi Navigation (Panama) Corp., S.A.*, 513 F. Supp. 148, 159 (E.D. La. 1981).

Wilson Yachts asserts that the undisputed facts establish Captain Coffman held a license to operate SDW, was properly trained, and did not have a record of safety infractions, rendering him competent.[1]  The Astriku parties do not contest these facts.  Instead, they argue that Captain

---

[1] Without conceding negligence on the part of Captain Coffman, Wilson Yachts argues, and the court agrees, that, without more, a captain's negligence is not charged to the owner's privity or knowledge on the undisputed facts present here. *See, e.g., In re MO Barge Lines, Inc.*, 360 F.3d 885, 891 n.5 (8th Cir. 2004) (holding that "when the owner is so far removed from the vessel that he can exert no control over the master's actions, he should not be taxed with the

Coffman's alleged incompetence was rooted in his performance on the day of the charter. They allege that Captain Coffman's deficiencies include the failure to give the passengers a safety briefing, allowing passengers, including the decedent, to jump off the deck roof, and not ensuring that the lifejackets worn by the decedent and his brother were properly secured.

The court agrees that the alleged "acts of negligence" are cabined to the alleged acts and omissions of Captain Coffman.[2] Therefore, the court next considers whether Wilson Yachts has met its burden as to whether Captain Coffman's alleged incompetence was within its privity and knowledge. Wilson Yachts argues that the undisputed facts establish it had no knowledge of, and was not in privity with, any alleged conduct of Captain Coffman. "No one from Wilson was present on the SDW on the day of the casualty, Wilson had no power to control the alleged conduct of Capt. Coffman, Wilson did not supervise or direct Capt. Coffman's navigation or management of the SDW on that day and Wilson had absolutely no knowledge of the events leading up to the casualty." (ECF 59 p. 7). The Astriku parties raise no challenge to this argument.[3]

Based on the undisputed facts, Wilson Yachts had no reason to be aware of potential negligence on the part of Captain Coffman, no one from Wilson Yachts was present on the day of the incident, or had any knowledge of, or control over, the events that led to decedent's death. The Astriku parties generate no dispute of fact regarding Wilson Yachts' familiarity with Captain Coffman or his qualifications, and raise no dispute as to the captain's credentials to captain SDW. Wilson Yachts is entitled to a limitation of liability under the Act.

---

master's negligence."); *see also Manhattan*, *supra,* 2018 WL 6684768 at *4, n.5 (holding "the owner of a vessel is typically not liable for the negligence of the captain if he has selected a competent captain and properly outfitted the vessel.")

[2] The court makes no findings of fact on Rule 56 motions and makes none here. Reference to Captain Coffman's alleged negligence is solely for purposes of analysis of Wilson Yacht's limitation of liability under the Act.

[3] Their only mention of the Act appears is in connection with their argument that Wilson Yachts and Sail Away formed a joint venture via Management Agreement. (ECF 78 at p. 18.)

### b.  Classification of Charter

Wilson Yachts further argues that it is not subject to liability at all due to the classification of the charter between Sail Away and Mr. Brew as a bareboat charter.  There are two categories of charters: a bareboat or demise charter, and time and voyage charters.[4]  Under a time or voyage charter, the owner of the vessel retains possession and control over the ship, provides the crew, and pays normal operating expenses.  *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993).  In contrast, the charterer of a bareboat or demise charter is considered the owner of the vessel for the charter term and takes over the operation and management of the boat.  *The Barnstable*, 181 U.S. 464, 468 (1901).

"Anything short of … a complete transfer is a time or voyage charter."  *Guzman v. Pichirilo*, 369 U.S. 698, 700 (1962).  Reservation of a small degree of control by the owner over the ship, however, does not preclude the finding of a bareboat charter, as an "owner properly may retain some modicum of oversight of the vessel … since a bareboat charter is, after all, a lease and not a complete transfer of title."  *Stolthaven Houston, Inc. v. Rachel B.*, No. 8 Civ. 4327 (RPP), 2008 WL 2854278, at *5 (S.D.N.Y July 18, 2008).  Indeed, bareboat charter agreements often include some restrictions on the charterer's use.  *See Leiblong v. Abella*, 503 F. Supp. 3d 1011, 1020 (D. Haw. 2020) (finding restrictions on use and movement of vessel consistent with bareboat charter).

The type of charter dictates the owner's liability for acts committed on the voyage.  Under a bareboat (or demise) charter, the owner of a ship is liable "only for unseaworthiness or negligence that pre-exists the charter."  *Kerr-McGee Corp. v. L.,* 479 F.2d 61, 63 (4th Cir. 1973).  Instead, the bareboat charterer is liable for the negligence of the crew and unseaworthiness.  *Forrester v. Ocean*

---

[4] As their names suggest, a time charter is distinct from a voyage charter, but for purposes of evaluating which parties bear legal responsibility for what, the distinction is immaterial.  Time and voyage charters are non-demise charters.

*Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993).  "This rule recognizes that when the owner of the vessel enters into a demise charter, he surrenders all possession and control of the vessel to the charterer. Since he no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership."  479 F.2d at 63. "Consequently, the bareboat charterer as a demise charterer is the owner *pro hac vice* of the vessel for the duration of the contract. The demise charterer is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel."  11 F.3d at 1215.

Wilson Yachts argues that the charter between Sail Away and Mr. Brew was a bareboat charter and, as a result, they are not liable for any alleged negligence of Captain Coffman.  Wilson Yachts points to the Charter Agreement, which transferred "full authority regarding the management of the Yacht to the Charterer for the Charter Term."  (ECF 59 Ex. 4.)  Captain Coffman testified that he was required to follow Mr. Brew's orders, as the charterer, and that he received no instruction from Wilson Yachts.  (ECF 59 Ex. 8 and 9).  The Wilson Yachts Motion further argues:

> The charter provided the charterer several options for selecting the crew, see Exhibit 4 at paragraph 15.  The charterer, if qualified to sail the vessel, can elect to sail the vessel himself or herself.  The charterer could choose to engage someone else (a friend relative or someone referred by an outside source) to sail the vessel, again if that person is qualified.  Or he or she might decide to hire a preapproved captain to sail the vessel for him or her during the charter.  Whatever option he exercised Sam Brew was provided full authority over the captain and whatever additional crew he chose to engage.

(ECF 59 p. 11.)  In addition to hiring a captain, Mr. Brew was also required to pay the captain and provide his own provisions for the trip.

### c.    The Astriku Parties' Opposition

The Astriku parties mount a multi-faceted challenge to the Wilson Yachts Motion, including: 1) the charter was a time or voyage (non-demise) charter, not a bareboat (demise)

charter; 2) Captain Coffman was SAI's agent; 3) Sail Away was the bareboat charterer of SDW, rendering Sail Away liable for the captain's alleged negligence; 4) the Management Agreement effected a joint venture between Wilson Yachts and Sail Away rendering Wilson Yachts liable for the captain's alleged negligence;[5] and 5) Captain Coffman's alleged negligence constitutes a breach of the warranty of seaworthiness, rendering Wilson Yachts liable by way of the joint venture theory. Each is addressed below.

### 1.    The SDW Charter was Not a Bareboat Charter

The Astriku parties argue that Mr. Brew "had no real control over SDW. He had no power to order Captain Coffman to materially deviate from the contract terms. He had no power to dismiss him. As shown through Coffman's admission, [Sail Away] and [Wilson Yachts] depended upon Coffman (indeed, all Preferred Captains) to enforce the terms of the charter." (ECF 78 p. 15.) The Astriku parties rely on Mr. Brew's testimony that he did not actually select Captain Coffman from the pre-approved captain list and, in fact, Mr. Brew had no power to dismiss the captain because he would be "'stuck in the middle of the water.'" (ECF 78 at p. 11, quoting Mr. Brew's deposition at p. 32.)

The Astriku parties fail to address the established legal principle that a shipowner is entitled to maintain modest elements of control over the ship by way of the terms of the charter without rendering it a non-demise charter, including duration of the charter, safety restrictions, restrictions on the purpose of the charter (*e.g.*, for pleasure and not commerce or trade), and the like. *See, e.g., Stolthaven Houston, Inc. v. Rachel B.,* No. 08 Civ. 4327, 2008 WL 2854278 (S.D.N.Y. July 18, 2008), *Silver Fox Live Procs.,* 1998 AMC 2623 (D. Ala. 1997); *Wills v. One Off, Inc.,* Civ. No. 08-11086, 2010 WL 1427502 (D. Mass. Apr. 8, 2010); Thomas J. Schoenbaum, *Admiralty and*

---

[5] The court will analyze together, in one subsection below, the Astriku parties' arguments that Sail Away was the bareboat charterer and that Sail Away and Wilson Yachts operated as a joint venture.

*Maritime Law* § 11-3 (6th ed. 2018).  Of course, where the shipowner is absent, these modest elements of control can only be exerted through the captain.

The Astriku parties' contention that the SDW charter was a non-demise charter because Mr. Brew had no "real" control over the captain in that he could not order him to "materially deviate from the contract terms" of the Charter Agreement fails to generate a dispute of material fact.  The plain language of the Charter Agreement delivers "full authority regarding management of the Yacht to the Charterer" (ECF 59, Ex. 4) subject to the basic restrictions that, as a matter of law (*see supra*), do not alone render a charter a non-demise charter.  No facts have been proffered to suggest that Mr. Brew sought to exert some element of management or control over the charter or SDW which he was denied.  General, conclusory assertions of the sort relied on by the Astriku parties are incompetent to raise a dispute of fact for purposes of Rule 56.  Similarly, protestation that Mr. Brew was powerless to terminate the captain mid-charter because that would leave him and his guests "stuck in the middle of the water" does not generate a factual dispute regarding control of the captain's engagement; rather it merely confirms that neither Mr. Brew, nor either of his guests, was competent to captain the boat.

The Astriku parties assert: "[t]here certainly is enough objectively ambiguous text" in the Charter Agreement such that the court would look to parole evidence to ascertain its meaning. (ECF 78 at p. 16.)  "All the Brew party desired or expected was to get on a boat and have someone supplied by the vessel owner drive them about the Bay.  Brew's testimony clearly shows he did not expect to be responsible for the boat and all the passengers in the face of a captain's negligence."  (ECF 78 at p. 16.)  The undisputed facts are precisely that the Brew party got on a boat and were driven about the Bay by "someone supplied by the vessel owner," which is consistent with the plain language of the Charter Agreement, which offers a pre-approved captain

should the charterer not supply his own.  No facts have been demonstrated to suggest Mr. Brew preferred to engage another captain or that he preferred not to engage Captain Coffman.  That Mr. Brew did not expect to be responsible for the boat and his passengers in the face of a tragic accident brought about by alleged captain misfeasance, while understandable, does not bear upon the character of the charter as a demise or non-demise charter; nor does it render the language of the Charter Agreement ambiguous.  The Astriku parties do not specify what language or provisions of the contract they contend is or are ambiguous; rather, they appear generally to rest on Mr. Brew's testimony that he may not have read it completely or appreciated its meaning.  Surely, Mr. Brew would not be the first person to enter a contract of this sort without examining it very closely.  And it may well be that Mr. Brew did not fully appreciate the effect or meaning of its individual provisions.  But these conditions do not render the contract ambiguous or entitle a contracting party to avoid its terms.  *Upton v. Tribilock*, 91 U.S. 45, 50 (1875); *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988).

### 2.     Captain Coffman was Sail Away's Agent

The Astriku parties assert that Captain Coffman was Sail Away's agent and therefore Sail Away is liable for his acts taken on its behalf, asserting that the court should find that "at the very least" the equitable doctrine of apparent authority applies to bind Sail Away to the actions of Captain Coffman.  Captain Coffman testified at deposition that his responsibility is to the chartering customer and "to do what, you know, they tell me to do, for the most part" and that his communication with Sail Away during a charter job is limited to keeping Sail Away informed on basics like weather, and arrival and departure times. (ECF 60, Ex. 2 at pp. 207-08.)

The Astriku parties proffer no facts to suggest that Sail Away said or did anything that would have caused or did cause Mr. Brew reasonably to believe that Captain Coffman had the

authority to act for Sail Away.  Instead, the Astriku parties ignore the express language in the Charter Agreement that Mr. Brew was responsible to engage a captain (whether someone known to him or through the provision of a pre-approved list of captains) and to pay the captain directly, and rely instead on Mr. Brew's testimony that he lacked "real" power over the captain to direct him to deviate from the Charter Agreement or to dismiss him.  Reliance on Captain Coffman's testimony that he would have required Mr. Brew to obtain Sail Away's consent to deviate from the terms of the charter is unavailing for the Astriku parties as evidence of an agency relationship. To the contrary, it suggests that Captain Coffman lacked the authority to act for Sail Away on which the Astriku parties rely.  These generalized assertions fail to set forth facts suggesting agency or that would otherwise compel application of the equitable doctrine of apparent authority.

While the Astriku parties focus their agency argument primarily on apparent authority, they have not set forth any record facts to suggest that Sail Away expressly acknowledged to Mr. Brew or anyone else that Captain Coffman would act on its behalf or that it had control over his actions; or that Captain Coffman's power to act as an agent for Sail Away was implied by actions taken by any party or the customs of a captain/charter company relationship, or in some way necessary for the Captain Coffman to serve as captain of the charter.  Thus, the Astriku parties fail to generate a dispute of material fact as to agency no matter the theory from which authority might flow.  *Wolf v. Celebrity Cruises, Inc.,* 683 Fed. Appx. 786, 2017 LEXIS 5348 (11th Cir. 2017); *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535 (2008); *Ceithaml v. Celebrity Cruises, Inc.*, 257 F. Supp.3d 1345 (S.D. Fla. 2016).

3.     **The Management Agreement Rendered Sail Away the Bareboat Charterer of SDW; and**

4.     **The Management Agreement Effected a Joint Venture between Wilson Yachts and Sail Away**

The Astriku parties assert that 1) the true legal effect of the Management Agreement is that Sail Away became the bareboat charterer of SDW, rendering Sail Away liable for the captain's alleged negligence; and 2) the Management Agreement effected a joint venture between Sail Away and Wilson Yachts such that Wilson Yachts is jointly and severally liable with Sail Away for the alleged negligence of Captain Coffman which caused the Astriku parties' harm.

The Astriku parties broadly urge that Wilson Yachts "relinquished" possession and control of SDW to Sail Away through the Management Agreement, which rendered Sail Away the bareboat charterer of SDW.  Therefore, they continue, Sail Away is liable for the acts of Captain Coffman.  Building upon that premise, the Astriku parties urge the court to find a triable dispute on the question of whether the Management Agreement effected a joint venture between the two entities the purpose of which was "the commercial chartering of SDW to the public."  (ECF 78 at p. 18.)

Upon examination of the Management Agreement (ECF 78, Ex. 1), the court disagrees with this assertion.  The Management Agreement expressly states that Wilson Yachts, as the vessel "Owner," will deliver SDW to Sail Away, which "operates a charter management and booking business," to "manage, maintain and act as the exclusive charter-booking agent for Owner's above-described Yacht."  (Management Agreement at recitals and ¶ 1.)  Further, pursuant to the Management Agreement, Sail Away is obligated to perform all cleaning, repairs and maintenance of SDW at Wilson Yacht's expense; and Sail Away agrees to manage "all charter sales income"

of SDW and will pay Wilson Yachts 60% of same less cleaning and maintenance fees, which, per paragraph 3, remain the obligation of Wilson Yachts. (*Id.* ¶¶ 3, 4.) Each party to the Management Agreement further agrees to maintain its own insurance – Sail Away shall maintain "business insurance" and Wilson Yachts shall maintain "hull insurance" and "protection and indemnity insurance." (*Id.* ¶ 6.) Importantly for purposes of the court's evaluation, the insurance section requires Wilson Yachts to list Sail Away as an "additional assured" and to "extend coverage to charterers as additional insureds." Notably, Sail Away "guarantees" that Wilson Yachts retains the right to "unlimited private use" of SDW during the term of the Management Agreement subject to charter scheduling conflicts during which SDW is in use by charterers who have contracted to use SDW through Sail Away's chartering booking services (as Mr. Brew did). (*Id.* ¶ 5.) Finally, the Management Agreement entitles Sail Away to offer "complimentary charters" of SDW for charter promotional purposes. (*Id.* ¶ 9.)

The duties and entitlements of the parties to the Management Agreement (Sail Away and Wilson Yachts) bear no resemblance to an agreement by which a shipowner agrees to charter a vessel to a charterer, whether demise or non-demise. No provision is made for selection or payment of a captain; no mention is made of the duration or navigation scope relative to any voyage or charter; and no mention is made as to the nature of any chartering relationship (*i.e.,* bareboat or time or voyage). The Astriku parties' broad assertion that the Management Agreement renders Sail Away a bareboat charterer finds no support in the Management Agreement itself; and they have otherwise failed to generate a genuine dispute of material fact as to the relationship of Sail Away and Wilson Yachts to oppose Wilson Yachts' Rule 56 motion on this front.

The Astriku parties' argument that Sail Away and Wilson have entered a joint venture via the Management Agreement (through which third party plaintiffs can reach Wilson Yachts) meets

a similar demise.  "A joint venture is created when 'two or more persons combine in joint business enterprise for their mutual benefit with the understanding that they are to share in profits and losses and each is to have voice in its management.'"  *Finch v. Hughes Aircraft*, 57 Md. App. 190, 236 (1984), quoting *Brenner v. Plitt,* 182 Md. 348, 355, 34 A.2d 853 (1943); and citing *Holtz v. United Plumbing & Heating Co.,* 49 Cal.2d 501, 319 P.2d 617, 620 (1957).  Further, "[w]hether or not a joint venture exists depends upon the intentions of the parties which is to be determined from the facts of the case and in accordance with ordinary rules governing interpretation of contracts."  *Id.* citing *Holtz v. United Plumbing & Heating Co.,* 319 P.2d at 620; *Myers v. Gager,* 175 Cal.App.2d 314, 346 P.2d 251, 255 (1959); *Beard v. Beard,* 185 Md. 178, 185 (1945).

As set forth above, the Management Agreement sets forth in plain language the parties' relationship whereby Wilson Yachts, as "Owner" of the vessel, will provide SDW to Sail Away for purposes of booking and managing charters of SDW by the public for a fee; adding to that, the integration clause at paragraph 17 states that the parties' entire charter management agreement is set forth in the Management Agreement, which shall not be altered, modified, or enlarged absent a mutual writing.  (Management Agreement at ¶ 17.)  No provision of the agreement pertains to a sharing of profits and losses; no mention is made of a mutual or shared enterprise over which each shall have managerial rights; and no provision of the agreement purports to extend a proprietary or ownership interest in SDW to Sail Away, which – according to the Astriku parties' joint venture argument – would be the "enterprise" shared by Sail Away and Wilson Yachts.  The Astriku parties' have failed to generate a genuine dispute of material fact as to the nature of the business relationship between Wilson Yachts and Sail Away as that of a joint venture.

**5.      Captain Coffman's alleged negligence constitutes a breach of the warranty of seaworthiness**

The Astriku parties argue next that Captain Coffman's alleged negligence rendered SDW unseaworthy, thus effecting a breach of the warranty of seaworthiness owed to Mr. Brew and his guests.  Building upon their argument that Wilson Yachts and Sail Away entered a joint venture by way of the Management Agreement, the Astriku parties assert that Wilson Yachts is liable to them for breach of the warranty.  (ECF 78 at p. 20.)  The warranty of seaworthiness extends to seamen and maritime workers not protected by the Longshore and Harbor Workers Compensation Act.  "Seamen" is a maritime term of art and does not apply to any claimant in this case. "Passengers and guests aboard a vessel . . . have no action for the breach of warranty of seaworthiness."  Thomas J. Schoenbaum, *Schoenbaum Admiralty and Maritime Law* §5-2 (6th ed., Dec. 2021 update); *see also Kermaruc v. Compagnie Generale Translantique,* 358 U.S. 625, 629 (1959) (affirming district court's refusal to instruct jury on warranty of seaworthiness on grounds that claimant was "aboard not to perform ship's work, but simply to visit a friend" and thus was not within the class of persons to whom the warranty extends).  Therefore, even were the court to find that the Astriku parties successfully generated a trial issue as to whether Wilson Yachts and Sail Away formed a joint venture, no person aboard SDW on August 8, 2019, is protected by the warranty of seaworthiness.

**II.     The Sail Away Motion**

Sail Away seeks summary judgment on the basis that the charter was a bareboat charter and not a time or voyage charter, and, therefore, Sail Away may not be held liable for the alleged negligence of Captain Coffman.  (ECF 60 *passim*.)  In response, the Astriku Third Party Plaintiffs assert the same arguments mounted in opposition to the Wilson Yachts Motion: 1) The SDW

charter was a time or voyage charter; 2) Captain Coffman was Sail Away's agent; 3) Captain Coffman's incompetence breached the warranty of seaworthiness owed to the charter passengers; 4) The Marketing Agreement created a joint venture between Sail Away and Wilson Yachts. (ECF 77.) Each of these arguments is addressed above and need not be stated here.

## III.   **The Coffman Motion**

The Coffman Motion seeks partial summary judgment as to: 1) The right of Joseph and Felicia Astriku, as parents of the decedent, to claim loss of society damages for wrongful death under general maritime law ("GML"); and 2. James Astriku's right to recover for emotional distress. Captain Coffman does not seek summary judgment on the Astriku parties' entitlement to pursue damages for wrongful death under Maryland common law. (ECF 63 at pp. 9-10.)

### a.   **Loss of Society Damages Under GML**

In response to the Coffman Motion, Joseph and Felicia Astriku assert that although they generally "disagree" that GML disallows wrongful death loss of society damages for non-dependents, they will instead pursue their wrongful death claim under Maryland law. (ECF 79 at pp. 4-5.) The court construes this as a voluntary abandonment by Joseph and Felicia Astriku of their action for wrongful death pursuant to GML. In any event, as set forth below, there are no genuine disputes of fact and Captain Coffman is entitled to judgment as a matter of law on this issue.

On the day Jerry Astriku died, his parents were 59 years old pensioners living in Ghana; they owned their home; and they were building a home for their sons. Occasionally, James and Jerry Astriku would send a few hundred dollars to their parents to contribute to the construction costs of the house; however, Joseph Astriku testified that he was paying for it. (ECF 63, Ex. 1 at pp. 111, 114 Ex. 2 at pp. 15, 33-35; Ex. 3 Bank of America records; Ex. 4 Answers to

Interrogatories.)   The decedent's father, Joseph Astriku, refused to produce or provide more financial details than are recited above.   The Astriku parties have failed to generate a dispute of material fact as to whether Joseph and Felicia Astriku were dependents of the decedent on the date he died.

The Supreme Court has imposed a dependency requirement for loss of society damages in GML wrongful death actions. *Miles v. Apex Marine Corp*., 498 U.S. 19, 23 (1990) (holding "a nondependent parent may not recover for loss of society in a general maritime wrongful death action.").   Therefore, Captain Coffman is entitled to partial summary judgment on the Astriku parties' claim for loss of society damages under GML.

### b.  Negligent Infliction of Emotional Distress

Under a theory of negligent infliction of emotional distress ("NIED"), James Astriku seeks damages from Captain Coffman attributed to witnessing his brother's death.   The parties do not dispute the following facts: 1) On the day of the incident, James Astriku did not know how to swim; 2) Captain Coffman put a PDF on James after which Captain Coffman entered the water to ensure James' safe entry into the water; 3) James entered the water and his PDF allowed him to float in the water as expected; 4) After James entered the water, the decedent, Jerry Astriku, jumped into the water and drowned; 5) James observed Jerry's drowning death and became hysterical; 6) After James observed his brother drown, while climbing back aboard SDW with assistance from Captain Coffman and Mr. Brew, James bruised an elbow and a knee for which he did not seek medical attention.

James does not contend he suffered emotional distress due to his bruised elbow and knee; rather, he asserts a right to emotional distress damages resulting from observing his brother die, which he contends was caused by Captain Coffman's negligence.

18

Although James Astriku alleges in his complaint that he sustained his minor physical injury in a rescue attempt to save his brother, at deposition James disclaimed that and testified he did not make a rescue effort.  Further, while the complaint ambiguously pleads, "James himself suffered personal injury and feared for his own life when he jumped into the water with a lifejacket," it is plain at this stage of the case that James does not allege he suffered physical injury when he jumped in the water and, in any event, does not seek to recover for damages for the bruises to his elbow and knee.  Moreover, James does not allege that Captain Coffman was negligent in connection with securing the PDF on James; and James does not contend that he entered the water for any reason other than he felt like swimming.  In other words, James does not contend that his placement or condition of being in the water is attributable to another's negligence.

The court examines Mr. Astriku's claim for NIED damages under two theories: the physical impact test and the zone of danger test.  The physical impact test is well summarized as follows:

> Under general maritime law, a plaintiff may "recover[ ] for emotional injury provided there is some physical contact." *Plaisance*, 966 F.2d at 168 (quotation omitted). That physical contact must, however, be more than "trivial." *See Ainsworth v. Penrod Drilling Corp.*, 972 F.2d 546, 547 (5th Cir. 1992) (per curiam); *see also Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 432, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (explaining that "physical impact" does not encompass "every form of 'physical contact'"). Therefore, "transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like," are insufficient to establish physical impact. RESTATEMENT (SECOND) TORTS § 436A cmt. c (Am. L. Inst. 1965); *see also Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1009 (5th Cir. 1991) (obtaining the requirements to satisfy the physical-injury test from that Restatement section). Moreover, there must be a causal relationship between the impact and the injury: the emotional injury must "result[ ] from" the physical contact. *Ainsworth*, 972 F.2d at 547.

*In re Deepwater Horizon*, 841 Fed. App'x. 675, 678 (5th Cir. 2021).

The zone of danger test "limits recovery for emotional injury to those plaintiffs who either sustain a physical impact as a result of the defendant's negligence or are placed in immediate risk

of physical impact by that negligence." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 547-48 (1994).  A plaintiff is in the zone of danger if he is "placed in immediate risk of physical harm." *Sawyer Bros., Inc. v. Island Transporter, LLC,* 887 F.3d 23, 28 (1st Cir. 2018).

Courts applying the zone of danger test to maritime cases have regularly found the requirements satisfied where plaintiffs were aboard ships that experienced "near misses," *e.g.,* almost capsizing or colliding with another vessel, because "a near miss may be as frightening as a direct hit."  *See id*. at 38-39 (quoting *Gottshall,* 512 U.S. at 547, and finding plaintiffs were in the zone of danger where they were aboard a car ferry inside vehicles and the size of the waves caused their vehicles to tip, so that they reasonably feared their vehicles would go overboard or that the vessel would capsize).

In the instant case, as set forth above, James Astriku does not allege emotional harm attributed to his bruises sustained upon reboarding SDW, nor did this minor injury require medical attention.  The court also notes that his expert witness does not describe emotional injuries in connection with his bruised elbow and ankle.  Rather, much like the plaintiff in *Deepwater Horizon*, Mr. Astriku's alleged emotional injuries stem from what he saw: witnessing his brother's drowning.  Because he fails to set forth facts supporting distress brought about by physical impact, Mr. Astriku must have been in the zone of danger to recover under a theory of NIED.

Mr. Astriku does not allege, and no facts suggest, that his PDF was not properly secured. To the contrary, it is undisputed that he was safely afloat in the water when his brother drowned. (ECF 63, Ex. 1.)  Further, the cause of Jerry Astriku's death was unique to the decedent; there was no near-miss or other condition that placed James Astriku in peril, and he does not so contend. Specifically, James Astriku does not contend that upon watching his brother drown that he became fearful that he, too, would drown by reason of an improperly secured PDF or by some other cause

attributed to Captain Coffman's alleged negligence.  Mr. Astriku does not allege he feared for his life or that he imagined he was in peril in any way.  Instead, he relies on what he refers to as "the continuum of the frightening experience" to place him within the zone of danger.  (ECF 79, p. 8.)

Whether under the physical impact test or the zone of danger test, James Astriku has failed to generate a genuine dispute of material fact to overcome the Coffman Motion on the issue of NIED.  Therefore, James Astriku is not entitled to pursue recovery for damages attributable to his emotional distress.

**CONCLUSION**

For the reasons set forth herein, Plaintiff Wilson Yacht's Motion for Summary Judgment or Partial Summary Judgment will be **GRANTED**; Third Party Defendant Sail Away's Motion for Summary Judgment will be **GRANTED**; and Third Party Defendant Steven Michael Coffman's Motion for Partial Summary Judgment will be **GRANTED.**  The court will issue an accompanying order in accordance with this memorandum opinion.

/S/

_____

Julie R. Rubin
United States District Judge